Filed 4/17/18

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ALPACINO McDANIELS,<br><br>     Defendant and Appellant. | A149015<br><br>(Alameda County<br>Super. Ct. No. C175145) |

     Defendant Alpacino McDaniels was charged with murder after 23-year-old Teric Traylor was shot and killed during a street fight in West Oakland. McDaniels's defense was that he was not the shooter, but a jury found otherwise and convicted him of one count of first degree murder and one count of being a felon in possession of a firearm.[1] The jury also found true three firearm enhancements accompanying the murder count, including that McDaniels personally and intentionally discharged a firearm causing death.[2]

     The trial court sentenced McDaniels to a total term of 50 years to life in prison, composed of a term of 25 years to life for the murder, a consecutive term of 25 years to life for the discharge of a firearm causing death, and a concurrent term of two years for

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I. and II.A. through II.D.

    [1] McDaniels, who stipulated that he had prior felony convictions, was found guilty under Penal Code sections 187, subdivision (a) (murder) and 29800, subdivision (a)(1) (felon in possession of a firearm). All further statutory references are to the Penal Code.

    [2] These allegations were found true under section 12022.53, subdivisions (b) (personal use of a firearm), (c) (personal and intentional discharge of a firearm), and (d) (personal and intentional discharge of a firearm causing death).

the firearm possession offense. Twenty- and ten-year terms for the other two firearm enhancements were stayed.

On appeal, McDaniels contends that (1) the trial court erred by denying his request for a pinpoint jury instruction about suggestive identification procedures; (2) the prosecutor committed misconduct by commenting on McDaniels's failure to testify; (3) the court should have stayed his sentence for the firearm possession offense; and (4) he is entitled to two additional days of custody credits and the abstract of judgment inaccurately reflects the sentence imposed for the murder count. We reject these claims, except we agree that the errors he identifies in the calculation of custody credits and the abstract of judgment must be corrected.[3]

In the published portion of this opinion, we also conclude that a remand is necessary in light of S.B. 620 (Stats. 2017, ch. 682). This legislation took effect on January 1, 2018, and applies retroactively. It vests sentencing courts with discretion to strike or dismiss firearm enhancements, including the three imposed here, in the interest of justice. We hold that a remand is necessary because the record contains no clear indication that the trial court will not exercise its discretion to reduce McDaniels's sentence. In so holding, we decline to adopt the standard recently applied by the Second District Court of Appeal that requires a remand only if the reviewing court determines that there is a reasonable probability the trial court will exercise its discretion in the defendant's favor. (*People v. Almanza* (Apr. 9, 2018, B270903) __ Cal.App.5th __ [2018 Cal.App.LEXIS 297] (*Almanza*).) We therefore remand the matter to the trial court for it to consider whether to strike the firearm enhancements, a disposition neither party opposes. We also direct the court to correct the errors in the calculation of custody credits and the abstract of judgment. Otherwise, we affirm.

---

[3] Although McDaniels does not raise a claim of cumulative error under a separate heading, he argues that the alleged instructional error and prosecutorial misconduct require reversal because of their individual and/or cumulative effect. As we conclude there was no error in either instance, no cumulative error appears.

I.

FACTS[4]

A.     *829 Mead Avenue.*

The murder occurred around 7:30 a.m. on July 6, 2013, on Mead Avenue, a one-block street that runs between San Pablo Avenue and Market Street in West Oakland. An Oakland police sergeant testified that the block, which is commonly referred to as "Mead Street," was "basically a 24-hour open air drug market" and had been the site of "numerous shootings" and other "violent activity." The primary site of drug sales was a liquor store at the corner of Mead and Market, but drug dealers would also station themselves elsewhere on Mead. The sergeant knew McDaniels, whose "street alias [was] Capone," and had seen him on Mead. McDaniels's "name would come up in some . . . narcotics investigations out there as one of the main . . . dealers from the block."

Charles F., who testified under a grant of immunity, lived at his stepmother's house at 829 Mead with several others. His father, Jeffrey F., lived in San Francisco but would visit the house on weekends. The night before the murder, Charles F. and Jeffrey F. were "up all night partying, drinking, smoking weed and just chillin' " at the house. Also present were Charles F.'s sister, L.F., and L.F.'s boyfriend, W.L., both of whom also lived at 829 Mead and had recently begun dating. Charles F. denied that drug sales or any other "illegal activities" occurred at the house. He admitted, however, that the month after the murder he was arrested in front of the home with "[f]ive rocks" in his pocket.

W.L. had moved into 829 Mead the previous winter after meeting one of Charles F.'s brothers in jail. W.L. testified that 829 Mead was a "trap house" where crack cocaine was used and sold. He knew McDaniels, who went by "Capone," because McDaniels was "a really good friend" of Charles F.'s and "would come over to 829 Mead" several times a week. W.L. had also seen McDaniels hanging out at the

---

[4] We do not publish our summary of the underlying facts because they are not material to our discussion of the issue of when a remand is required for a trial court to exercise its discretion to strike firearm enhancements. (See Cal. Rules of Court, rule 8.1110(b).)

liquor store at Market and Mead, which he knew as a site of drug activity. W.L. testified that he never had any problems with McDaniels, though he did not consider him a friend.

According to W.L., the night before the murder McDaniels was outside on the porch of 829 Mead while everyone else was drinking and smoking. Charles F., on the other hand, claimed that McDaniels was not present. Indeed, he denied personally knowing McDaniels, although he was aware that McDaniels used to hang out on Mead. Charles F. claimed that he would greet McDaniels if he saw him on the street, but that McDaniels had never been to his house. Jeffrey F. acknowledged knowing McDaniels as "Capone" and similarly claimed to have seen him in the neighborhood but never at 829 Mead.

*B.     The Fight on Isabella Street.*

The morning of the murder, Charles F. and Jeffrey F. went to a convenience market to buy food. Charles F. was wearing a tank top, and his father was wearing a brown sweatshirt. Although the market was on Isabella Street, only a few blocks away, Charles F. drove them there in his green Cutlass. The two men were still intoxicated, and after Charles F. got out of the car Jeffrey F. drove it away as a joke.

Left standing in the market's parking lot, Charles F. began yelling at his father. Traylor, whom neither Charles F. nor Jeffrey F. had seen before, became upset by the yelling and told Charles F. something to the effect of "shut the fuck up." After Jeffrey F. came back, Charles F. and Traylor continued to argue as all three men walked into the middle of Isabella. Charles F. and Traylor "did a lot of circling" as if they were going to fight but did not throw any punches.

A man who lived in a nearby condominium testified that at about 7:15 that morning, he and his wife "heard a disturbance" outside their window, which faced onto Isabella. They observed a small group of people, two of whom were "squaring off" and seemed ready to fight. Both were African-American men and appeared to be in their twenties. One of the men "was shorter and more squat," had dreadlocks, and was wearing a white tank top, a description matching Charles F. The other man "was taller and . . . more lean" and had "very short hair," a description matching Traylor.

4

The wife also described two other African-American men present who were "encouraging the fight." One was an "older gentleman" with "some salt and pepper hair" who was "wearing a brown sweatsuit outfit," a description matching Jeffrey F. The other was "around 30, larger, about 6 foot, . . . [and] probably about 200 pounds, wearing a black hooded sweatshirt and black sweat pants."

The husband left to go out, and he drove his car from the building's garage onto Isabella. He headed down the street toward the group of men, who were blocking his way. He asked them to move, and he then heard "a big thud" from the back of his car. He believed one of the bystanders had kicked or punched his car, and he described that man as "closer in composition to the leaner guy that was squaring off in the fight" and "maybe 5'10", 5'11"." The bystander had "close cropped" hair that "wasn't dreadlocks" and "may have [had] some facial hair," and he was wearing "dark clothing" and smoking a cigarette. At trial, the husband was unable to identify the bystander as McDaniels. Charles F. testified that he could not recall anyone present on Isabella kicking or punching a car.

Meanwhile, the wife called the police to report the fight. She watched her husband exit the garage and saw the bystander wearing "the black sweat outfit" yell something and kick the car. Her husband drove away, and she hung up after being told police units had been dispatched. She eventually saw the man whose description matched Jeffrey F. walk up Isabella while the man whose description matched Charles F. got into the driver's seat of a parked green sedan. The man wearing the black sweatsuit got into the passenger's seat of the green sedan, and the car headed up Isabella. Finally, the man whose description matched Traylor began walking up Isabella in the same direction as the other men had gone.

Consistent with the wife's testimony, Charles F. said he drove back to Mead, leaving his father and Traylor on Isabella. Jeffrey F. also confirmed that he walked down Isabella toward Mead and Traylor followed him. When Charles F. got back, he parked and went inside 829 Mead, where he saw L.F. and W.L. Charles F. went back outside to check on his father, and L.F. and W.L. eventually came outside as well. Charles F. heard

5

his father and Traylor yelling as they approached. Jeffrey F. and Traylor then turned onto Mead, and Charles F. and Traylor started physically fighting.

        *C.     The Murder.*

        1.     W.L.'s testimony about the murder.

W.L. testified that he was standing on 829 Mead's porch and saw Charles F. and Traylor in the middle of the street fighting with each other. W.L. described Traylor as a "young boy" whom he had not seen in the neighborhood before. "[A] fairly large crowd" was present, and W.L. could hear people saying, " 'Whoop his ass. Get him. Beat his ass. He's a bitch. You're a bitch. Whoop his ass. I'm going to fuck you up, motherfucker,' that terminology." It appeared to W.L. that Traylor was winning the fight.

W.L. then observed a man he had never seen before hand a semiautomatic chrome gun to McDaniels, who was wearing a black hooded sweatshirt and had been holding a beer and smoking a cigarette. Still holding the beer, McDaniels "opened fire" on Traylor, hitting him. W.L. heard about six "sporadic[]" shots before McDaniels handed the gun back to the same man. Traylor tried to run away, and many of the spectators, including McDaniels, ran into 829 Mead. W.L. saw a woman, whom he knew as "a local crackhead," picking up shell casings from the street.

W.L. testified that he did not speak to the police on the day of the murder because he had an outstanding warrant. Three days later, he was arrested at 829 Mead for domestic violence against L.F. On the way to jail, he reported the murder to a police officer and was taken to be interviewed by detectives. During the interview, he identified McDaniels as the shooter from a photographic lineup. W.L. also told the detectives, contradicting his testimony at trial, that when the shooting began McDaniels "already had the gun on him."

At trial, W.L. admitted he reported the murder to the police because he wanted to avoid being sent to jail. He also admitted he lied by telling the police he was "[r]ight in the middle of" the fight, not on the porch, when the shooting occurred, and he explained

6

that he did so because he thought the police would then be more inclined to believe him. W.L. stated that he was nervous about testifying but felt it was "the right thing to do."

2.      M.G.'s testimony about the murder.

At the time of the murder, M.G. was a resident of a treatment program to address her addiction to heroin. The recovery center was located on Mead, and her apartment had a view of that street. Around 7:30 a.m., M.G. was awakened by the sound of arguing. She went to the window to see what was happening, and she saw two men fighting while several other people watched and "egged [them] on."

One of the fighters, whose description matched Charles F., was a "black man with dreads" who was "heavyset" or "fat" and looked to be in his thirties. He was wearing a white tank top and blue jeans. She did not know his real name, but she had seen him on Mead before and thought he went by "Chunky."[5] The other was Traylor, whom she did not know and whom she described as in his late teens or early twenties and "small." She did not see a weapon in either man's hands.

The men eventually stopped physically fighting, but they were still arguing in the middle of the street. According to M.G., Traylor "kept calling dude with the dreads a bitch, and dude with the dreads kept saying, 'Oh, I'm a bitch? Oh, I'm a bitch?' " M.G. then saw McDaniels turn the corner from San Pablo onto Mead. She did not know his real name, but she had known him "by face" for about four years. He was a drug dealer, and she had bought marijuana from him once or twice. At some point before the murder, he had also hit on her.

M.G. testified that as McDaniels turned onto Mead, he walked into the street. He was wearing a black hooded sweatshirt and blue jeans. She did not see McDaniels holding either beer or cigarettes, in contrast to what W.L. had claimed to see. M.G. heard Charles F. say " '[g]ood night' " to Traylor. McDaniels then asked Traylor, "[O]h, he a bitch?," and "pulled . . . out" a "silver automatic" gun. M.G. saw Traylor start walking

---

[5] Charles F.'s actual nickname was "Cheese." He denied that anyone had ever called him "Chunky," although he also testified that the nickname "Cheese" came from "Chucky Cheese."

away, and McDaniels fired seven or eight shots, hitting Traylor in the back. Traylor collapsed, and McDaniels handed the gun to another person and ran up the street. M.G. then saw a woman picking up shell casings.

Shortly after the shooting, M.G. told a friend she had just witnessed a murder and knew the person who had done it. The recovery center's property manager overheard M.G. and "made [her] talk to the police." M.G. was reluctant to talk to the police, because she did not want to become known as a "snitch." Despite her fear, she shared what she had seen because she "felt bad for that boy [who] got killed."

M.G. first talked to the police in her apartment on the same day as the murder. At the time, she told the police that the shooter's nickname was "JoJo." Two days later, the police interviewed her at the station. She said the shooter's name was "JoJo," "Rally," "Raley," or "Wally." She thought he had a brother named Lamar and a cousin named Raven and had dated a friend of her uncle's, but none of these representations about McDaniels's nicknames or relationships turned out to be accurate.

M.G. also told the police that she did not think McDaniels had any tattoos. In fact, McDaniels has several tattoos, and photographs of them were introduced into evidence. Among the tattoos was one on his back that said "Mead Street" and others on his forearm and upper arm. M.G. testified that she could not remember whether the shooter's sleeves were up during the shooting and thus whether she could see his arms.

At a third interview with the police, M.G. was shown a single photograph of McDaniels, and she identified him as the shooter. Another police sergeant testified that M.G. was shown a single photograph instead of a lineup because after M.G.'s second interview "it was apparent that she provided very in-depth details about Capone in terms of how long she's known him . . . [and] the last time she'd seen him." M.G. was also shown three sequential photographic lineups, one containing Charles F.'s photograph, one containing Jeffrey F.'s photograph, and one containing W.L.'s photograph. She identified another man, not Charles F., as the person she saw fighting with Traylor, and she was unable to identify either Jeffrey F. or W.L.

M.G. never saw McDaniels in the neighborhood again in the subsequent year she lived at the recovery center. She testified that after the murder, she was threatened and told not to testify in the case four times. This made her feel afraid and reluctant to testify but "the thing that happened was wrong," so she felt compelled to tell her story in court. M.G. admitted she had unsuccessfully sought compensation for cooperating with the police.

   3.  Charles F.'s testimony about the murder.

Charles F. testified that he and Traylor started throwing punches at each other while Jeffrey F. watched. Charles F. could hear other people yelling " '[b]eat his ass.' " Jeffrey F., on the other hand, denied watching the fight once it was relocated to Mead. He testified that as soon as he got back to Mead, he went inside 829 Mead. He claimed he immediately fell "[d]ead asleep" and did not witness or hear the subsequent shooting, even after the prosecutor played a surveillance video that showed him at the scene.

Charles F. claimed that he heard about four gunshots but did not see Traylor get shot, despite the fact the two men were facing each other. Charles F. also consistently denied, both in his police interviews and at trial, that he had seen the shooter. He testified that he went inside 829 Mead after the shooting, where several of his family members and W.L. had congregated. Charles F. claimed he immediately went to sleep and did not see the police arrive on the scene, and he also claimed he did not learn Traylor had died until later. He testified that he had last seen McDaniels a few days before the shooting and never saw him around the liquor store at Market and Mead again.

   4.  The physical evidence.

Traylor was shot once in the chest and twice in the back, and he died from his wounds. There were no significant levels of drugs or alcohol in his system. A bullet fragment and three shell casings were found at the scene. A criminalist testified that the same gun fired the casings. Cigarette butts were also collected from the scene, but DNA testing revealed DNA that was not McDaniels's. Neither a beer container nor the gun was recovered. The police were unable to locate the woman who was seen picking up shell casings.

D. *McDaniels's Arrest.*

After M.G. identified McDaniels, a warrant was issued, but almost a year passed before he was arrested in Rancho Cordova and taken to Sacramento County jail. He was recorded several times during phone calls and visits at the jail expressing surprise that law enforcement had known where to find him.

McDaniels's girlfriend, who was the only defense witness, had been dating him for several years, and they had two sons together. They lived together in San Pablo at the time of the murder, but she claimed the family moved to Rancho Cordova two months after the murder so McDaniels could work as a contractor with his father. She explained that because McDaniels was dealing drugs on Mead and did not have a job, it was hard to meet their rent in the Bay Area. She denied they had any reason to keep away from Oakland.

II.

DISCUSSION

A. *The Trial Court Did Not Err by Denying McDaniels's Request for a Pinpoint Instruction on the Suggestiveness of Identification Procedures.*

McDaniels contends that the trial court erred by declining his request for a pinpoint instruction that would have directed the jury to " 'consider any pretrial procedures which may have suggested to the witness that the defendant should be chosen.' " We are not persuaded.

1. Additional facts.

Before trial, McDaniels filed a motion to exclude M.G.'s identification testimony "as being the product of unduly suggestive police procedures." The trial court denied the motion, a ruling McDaniels does not challenge on appeal.

During a discussion of jury instructions, McDaniels asked the trial court to give the following pinpoint instruction: " 'In weighing an eyewitness identification made by a witness, consider any pretrial procedures which may have suggested to the witness that the defendant should be chosen.' " The court denied the request, agreeing with the prosecutor that CALJIC No. 2.92, which addresses the factors guiding a jury's evaluation

10

of eyewitness identification testimony, was "sufficient." The court also indicated that the defense could argue that M.G.'s identification was the product of a suggestive procedure in addressing those factors.

In closing argument, McDaniels's trial counsel argued at length that M.G.'s identification was unreliable. Counsel highlighted that M.G. identified McDaniels after the police showed her only one photograph, "the single most prejudicial way to get an identification." Counsel argued that although the police attempted to justify this procedure on the basis that M.G. knew McDaniels, the information M.G. provided about McDaniels was mistaken in several aspects, including as to which names he was known by and whether he had tattoos.

The jury was instructed under CALJIC No. 2.92 that "[i]n determining the weight to be given eyewitness identification testimony, you should consider the believability of the eyewitness as well as other factors which bear upon the accuracy of the witness'[s] identification of the defendant, including, but not limited to," several factors. These factors included "[t]he extent to which the defendant either fits or does not fit the description of the perpetrator previously given by the witness," "[w]hether the witness was able to identify the alleged perpetrator in a photographic or physical lineup," "[w]hether the witness had prior contacts with the alleged perpetrator," and "[w]hether the witness'[s] identification is in fact the product of his or her own recollection." The jury was also instructed it could consider "[a]ny other evidence relating to the witness'[s] ability to make an identification."

2.    Discussion.

A trial court is required to instruct the jury " ' "on the general principles of law governing the case." ' " (*People v. Bell* (2009) 179 Cal.App.4th 428, 434.) In particular, a "[d]efendant is entitled to an instruction that focuses the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1230.) "[A]n explanation of the *effects* of those factors," however, "is best left to argument by counsel, cross-examination of the

11

eyewitnesses, and expert testimony where appropriate." (*People v. Wright* (1988) 45 Cal.3d 1126, 1143.) Our state Supreme Court has "noted that CALJIC No. 2.92 normally provides sufficient guidance on the subject of eyewitness identification factors." (*Johnson*, at pp. 1230-1231.)

Upon request, a defendant is also " 'entitled to adequate instructions on the defense theory of the case' if supported by the law and evidence." (*People v. Bell, supra*, 179 Cal.App.4th at p. 434.) The instruction requested here was a pinpoint instruction, which "relate[s] particular facts to a legal issue in the case or 'pinpoint[s]' the crux of a defendant's case." (*People v. Saille* (1991) 54 Cal.3d 1103, 1119; see also *People v. Garvin* (2003) 110 Cal.App.4th 484, 488-489.) A pinpoint instruction need be given only upon request, and only if "there is evidence supportive of the theory" and the " 'proffered instruction . . . is [not] an incorrect statement of law,' argumentative, duplicative, or confusing." (*Saille*, at p. 1119; *Bell*, at pp. 434-435.) We review claims of instructional error de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

McDaniels quotes the governing legal standards at length, but his opening brief's only explanation of why the requested instruction should have been given is that it "properly focused on the 'crux' of the defense, which was that [M.G.] had mistakenly albeit honestly identified [him] in error." Although we accept that there was substantial evidence to support the instruction, we agree with the Attorney General that it was argumentative and duplicative. It was argumentative because it implied the police had used an improper identification procedure, by referring to "pretrial procedures which may have suggested to the witness that the defendant should be chosen." And it was duplicative because the jury was already instructed that it could consider "[w]hether the witness'[s] identification is in fact the product of his or her own recollection" and "[a]ny other evidence relating to the witness'[s] ability to make an identification."

In arguing otherwise in his reply brief, McDaniels relies on two decisions. He cites *People v. Jackson* (1996) 13 Cal.4th 1164 (*Jackson*) in contending the requested instruction was not argumentative. *Jackson* rejected a defendant's claim that CALJIC Nos. 2.03, 2.04, 2.06, and 2.52 were improper pinpoint instructions, observing that they

12

"made clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior." (*Jackson*, at pp. 1222-1224.) Thus, the "instructions did not improperly endorse the prosecution's theory or lessen its burden of proof." (*Id.* at p. 1224.)

McDaniels offers the conclusory assertion that "[i]f the 'consciousness of guilt' instructions at issue in *Jackson* were not 'argumentative,' [his] proposed instruction was not itself 'argumentative,' " but he does not explain how the *Jackson* instructions are analogous to the instruction he proposed. True, all these instructions implied a particular factor weighed in favor of a particular finding:  the *Jackson* instructions posited that a defendant's flight or escape indicates guilt, and the proposed instruction posited that a suggestive identification procedure indicates a false identification. All the instructions at issue in *Jackson*, however, included language explicitly informing jurors that a particular factor was "not sufficient" alone to prove guilt and that they had to decide what "weight" to give the factor. (CALJIC Nos. 2.03, 2.04, 2.06, 2.52.) Here, in contrast, the proposed instruction gave no guidance on how an identification procedure's suggestiveness should impact the jury's overall analysis.

Second, McDaniels cites *People v. Farnam* (2002) 28 Cal.4th 107 in claiming the requested instruction was not duplicative. *Farnam* affirmed a modified version of CALJIC No. 2.06 that gave a specific example of how the defendant could have attempted to suppress evidence, " 'by concealing evidence in his attempt to refuse to comply with the court order requiring his blood and hair samples.' " (*Farnam*, at pp. 164-165 & fn. 28.) But the *Farnam* defendant did not contend the instruction was duplicative, and the decision did not address that issue. Therefore, *Farnam* provides no support for McDaniels's position. (See *People v. Knoller* (2007) 41 Cal.4th 139, 155 [" ' "An opinion is not authority for propositions not considered" ' "].) McDaniels fails to convince us that the trial court erred by refusing to give the requested instruction.

13

Even if the trial court had erred, the error was harmless. McDaniels argues that we should apply the standard from *Chapman v. California* (1967) 386 U.S. 18, 24, under which we ask whether the error was harmless beyond a reasonable doubt. *Chapman* applies "[w]hen the jury is 'misinstructed on an element of the offense,' " but the failure to give a requested pinpoint instruction is "state law error" that requires reversal "only if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error' " under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Wilkins* (2013) 56 Cal.4th 333, 348-349.) McDaniels does not explain how the proposed instruction bore on an element of the charged offenses or how the trial court's failure to give it violated his right to present a complete defense. Therefore, we will consider whether it is reasonably probable that he would have received a more favorable verdict had the court given the instruction.

We agree with the Attorney General that any error was not prejudicial under this standard. Evidence was admitted that M.G. identified McDaniels from a single photograph but could not identify other participants in the fight in sequential lineups, and nothing prevented the jury from considering these facts in determining what weight to give her identification. Indeed, the jury was instructed under CALJIC No. 2.92 to consider a non-exclusive list of factors and "[a]ny other evidence relating to the witness'[s] ability to make an identification." And in closing, McDaniels's trial counsel argued at length that M.G.'s identification was unreliable, including because it was the product of a suggestive procedure. Therefore, "[i]t is unlikely the jury hearing the evidence, the instructions given[,] and the argument of counsel would have failed to give the defendant's position full consideration." (*People v. Gonzales* (1992) 8 Cal.App.4th 1658, 1665 [holding, on similar grounds, that any error in refusing to give pinpoint instruction was harmless]; see also *People v. Ervin* (2000) 22 Cal.4th 48, 91.)

B. *The Prosecutor Did Not Improperly Comment on McDaniels's Silence.*

McDaniels claims the prosecutor's rebuttal to the defense's closing argument was improper under *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*), which held that a prosecutor's commentary on a defendant's failure to testify violates the federal

14

Constitution.  (*Id.* at p. 615.)  We conclude the prosecutor's comments did not constitute *Griffin* error.

    1.   Additional facts.

  Before the prosecutor gave his rebuttal argument, he provided McDaniels's trial counsel with a copy of *People v. Morris*, which addressed a claim of *Griffin* error.  (*People v. Morris* (1988) 46 Cal.3d 1, 35 (*Morris*), disapproved on other grounds by *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5.)  Defense counsel objected "to any reference to [her] client's silence" and "any argument about [her] client not calling any witnesses . . . that he could have called."  The prosecutor responded that *Morris* was good law and he merely wished to avoid "a bunch of objections while . . . reading a portion of [his] argument."  The trial court indicated the prosecutor could comment on the state of the evidence.

  Closely following language approved in *Morris*,[6] the prosecutor argued in rebuttal as follows:

>   Everything comes together, ladies and gentlemen.  The bits of the puzzle come together to fit and point to Mr. Alpacino McDaniels.  And nothing points to anyone else, anybody else.  Keep in mind, that there is not a shred of evidence, not a shred to suggest that anyone else did the killing [¶] . . . [¶] other than Alpacino McDaniels.  Not a shred.  There's not a shred of evidence to indicate that Alpacino McDaniels was anywhere else on the morning of July 6th, 2013.  Nothing.
>
>   [¶] . . . [¶]

---

  [6] *Morris* held that there was no *Griffin* error where the prosecutor argued as follows:  " 'Everything else comes together.  The bits of the puzzle come together to fit the point of Mr. Morris.  And nothing points at anyone else. [¶] 'Keep in mind that there is not a shred of evidence.  Not a shred to suggest that anybody else did the killing, other than Oscar Lee Morris.  Not a shred. [¶] 'There is not a shred of evidence to indicate that Oscar Morris was anywhere else on the morning of September 3, 1978. [¶] 'Nothing.  Put yourself in the position of being a defendant, and you can bet your boots that if you had anything to offer by way of evidence, by way of alibi, that you would offer it.  Be assured of that.  Be assured of the fact that any defense attorney would make sure that if any such evidence existed, you would have it.  You don't have it. [¶] 'There is nothing, nothing to gainsay Mr. West, Mr. Billdt, Mr. Johnson, and all of this evidence comes directly at Oscar Morris.' "  (*Morris, supra*, 46 Cal.3d at pp. 35-36.)

Put yourself in the position of being a defendant. You can bet your boots that if you had anything to offer by way of evidence, by way of alibi, that you would offer it. Be assured of that. Be assured of the fact that any defense attorney would make sure that if any such evidence existed you would have it. You don't have it.

What are we left with, ladies and gentlemen? Two identifications of Alpacino McDaniels as the shooter, independent corroborative, circumstantial evidence to prove that those identifications are correct.

2.     Discussion.

In *Griffin*, the United States Supreme Court held that the federal Constitution "forbids . . . comment by the prosecution on the accused's silence." (*Griffin, supra*, 380 U.S. at p. 615.) "Pursuant to *Griffin*, it is error for a prosecutor to state that certain evidence is uncontradicted or unrefuted when that evidence could not be contradicted or refuted by anyone other than the defendant testifying on his or her behalf." (*People v. Hughes* (2002) 27 Cal.4th 287, 371.) "But although ' "*Griffin* forbids either direct or indirect comment upon the failure of the defendant to take the witness stand," ' " the decision does not prohibit " ' "comments on the state of the evidence or on the failure of the defense to introduce material evidence or call logical witnesses." ' " (*Id.* at p. 372.)

"To determine whether a prosecutor's comment violated *Griffin*, a reviewing court must decide whether there is a 'reasonable likelihood' that the jury construed the remark as a commentary on the defendant's failure to testify." (*People v. Carter* (2005) 36 Cal.4th 1215, 1282.) In conducting this review a court " ' "do[es] not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1403.)

We begin by agreeing with McDaniels that the rebuttal argument's similarity to the statements approved in *Morris* does not conclusively establish there was no *Griffin* error. Although the similarity may establish that the passage the prosecutor read was not an improper *direct* comment on McDaniels's silence, McDaniels does not contend otherwise. Instead, he claims the passage was an improper *indirect* comment on his silence because "[t]here was no logical and non-hypothetical witness other than [himself]

16

who could have been produced by the defense to establish 'that [he] was [some]where else on the morning of July 6th, 2013.' " (Italics omitted.) Whether there is a reasonable likelihood that a jury interpreted a prosecutor's argument to be an indirect comment on a defendant's silence turns on the particular evidence presented and is necessarily fact-specific, and in theory the argument approved in *Morris* could be improper in a case with different facts.

Here, McDaniels argues that given nearly a year passed between the murder and his arrest, he was in no position to "dredg[e] up" any "potential 'alibi' witness[es]." But depending on what he was supposedly doing at the time of the murder, testimony from any number of witnesses, not to mention other types of evidence, might have been introduced to establish that he was not on Mead when the murder occurred. Indeed, he and his girlfriend were living together at the time of the murder, and she testified that he generally came home at night but that it was also "common" for him to stay at his mother's house. Given that the murder happened early on a Saturday morning, the jury could have reasonably wondered why neither McDaniels's girlfriend nor his mother could provide him with an alibi.

In any event, McDaniels does not provide any authority to support his position that the prosecutor could not comment on his failure to provide an alibi absent the existence of a specific, "non-speculative" witness who could have given him one. In *People v. Szeto* (1981) 29 Cal.3d 20, the Supreme Court held there was no *Griffin* error when the prosecutor "merely pointed out that the defense had not produced alibi witnesses for the crucial period." (*Id.* at p. 34; see also *People v. Echevarria* (1992) 11 Cal.App.4th 444, 452 [no *Griffin* error where prosecutor observed that none of the defense witnesses could tell jury " 'where [the defendant] was that night' "].) Under *Szeto*, a prosecutor is not precluded from remarking on the lack of alibi evidence simply because the defense has not indicated what the alibi might be, and thus which specific witnesses or other evidence might be available to support it. McDaniels fails to convince us that the prosecutor's rebuttal argument here violated *Griffin*.

17

C. *Section 654 Does Not Require a Stay of the Sentence for Being a Felon in Possession of a Firearm.*

McDaniels claims his sentence for being a felon in possession of a firearm should have been stayed under section 654 because "there was no evidence that the gunman possessed the firearm other than at the time of the shooting." We disagree.

Section 654 provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) The statute "generally precludes multiple punishments for a single physical act that violates different provisions of law [citation] as well as multiple punishments for an indivisible course of conduct that violates more than one criminal statute." (*People v. Newman* (2015) 238 Cal.App.4th 103, 111-112, italics omitted.) Even if convictions arise from the same course of conduct, "section 654 [is] inapplicable . . . if the defendant ' "entertained multiple criminal objectives which were independent of and not merely incidental to each other." ' " (*Id.* at p. 112.)

Here, the trial court sentenced McDaniels to a concurrent term of two years for being a felon in possession of a firearm. We review the court's implicit determination that section 654 does not apply for substantial evidence. (*People v. Rodriguez* (2015) 235 Cal.App.4th 1000, 1005.) In doing so, we consider the court's finding " 'in the light most favorable to the respondent and presume the existence of every fact the . . . court could reasonably deduce from the evidence.' " (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1378.)

"Case law establishes the guidelines for applying section 654 in the context of a conviction for possession of a prohibited weapon" where the weapon was used to commit another crime of which the defendant was also convicted. (*People v. Wynn* (2010) 184 Cal.App.4th 1210, 1217.) " ' "[W]here the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved. On the other hand, where the evidence shows a possession only in conjunction

with the primary offense, then punishment for the illegal possession of the [weapon] has been held to be improper where it is the lesser offense." ' " (*Ibid.*, quoting *People v. Bradford* (1976) 17 Cal.3d 8, 22.) "Applying this rule, courts have determined that section 654 applies where the defendant obtained the prohibited weapon *during* the assault in which he [or she] used the weapon," but they have determined that section 654 does "not . . . apply when the weapon possession preceded the assault." (*Wynn*, at p. 1217.)

McDaniels argues that here, "there was no evidence of firearm possession outside the time of the shooting. Indeed, [W.L.] testified that the pistol was handed to the gunman who used and returned it." Had that testimony been the only evidence of how the shooter came into possession of the gun, we might agree with McDaniels that the sentence for the possession conviction should be stayed. (See *People v. Cruz* (1978) 83 Cal.App.3d 308, 333 [section 654 applied where defendant was turned away from bar and shortly returned with gun and shot doorman]; see also *People v. Venegas* (1970) 10 Cal.App.3d 814, 822 [section 654 applied where no evidence of firearm possession except at time of shooting].) But M.G. testified that she saw McDaniels come around the corner and soon after pull a gun from his waist area, and this constitutes substantial evidence that he possessed the gun before the shooting. Moreover, there was no evidence compelling the conclusion that McDaniels obtained the gun for the express purpose of shooting Traylor. Therefore, we conclude the trial court did not err under section 654.

> D.      *The Calculation of Custody Credits and the Abstract of Judgment Must Be Corrected on Remand.*

McDaniels contends that an error in the probation report led to his being awarded too few days of custody credits and that the abstract of judgment inaccurately reflects the sentence imposed for the murder conviction. The Attorney General concedes both points, and these errors should be corrected on remand.

First, McDaniels claims he should have been awarded two additional days of custody credits for actual time served. The probation report reflects he was arrested on June 19, 2014, which was the date he was taken into custody by the Oakland Police

19

Department, but the evidence presented at trial confirms he was actually arrested on June 17, 2014, and spent two days in jail in Sacramento County. The trial court sentenced him on June 17, 2016, and awarded him 730 days of actual custody credits, omitting the first two days he spent in custody.[7] We agree with McDaniels that he was entitled to credit for those two days (see § 2900.5, subds. (a) & (b)), and on remand the court must include the period of custody in Sacramento County in its award.

Second, McDaniels accurately observes that the abstract of judgment does not reflect the sentence the trial court imposed for the murder conviction. The court sentenced him to a term of 25 years to life for murder and an accompanying term of 25 years to life for personally and intentionally discharging a firearm causing death, a total term of 50 years to life on the murder count. The abstract of judgment, however, reflects a term of 50 years to life for the murder conviction and a term of 25 years to life for the same firearm enhancement, a total term of 75 years to life. On remand, the court must ensure the abstract reflects the accurate term.

### E. Remand Is Required for the Trial Court to Consider Whether to Strike the Firearm Enhancements.

At the time it sentenced McDaniels, the trial court had no discretion to strike the three firearm enhancements imposed under section 12022.53. (Former § 12022.53, subd. (h).) In October 2017, however, the Legislature passed S.B. 620, which took effect on January 1, 2018. The statute provides that "[t]he court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section." (§ 12022.53, subd. (h).) The discretion conferred by the statute "applies to any resentencing that may occur pursuant to any other law" (*ibid.*), and it applies retroactively to non-final judgments. (*People v. Woods* (2018) 19 Cal.App.5th 1080, 1090-1091; see also *People v. Conley* (2016)

---

[7] The trial court correctly determined that because McDaniels was convicted of murder, he was not entitled to any conduct credits under section 4019. (See § 2933.2, subds. (a) & (c).)

63 Cal.4th 646, 656.) We conclude that a remand is necessary here for the trial court to exercise its discretion whether to strike the firearm enhancements.

McDaniels filed his opening brief before S.B. 620 passed, and the parties did not address the legislation's consequences in their subsequent briefing. After S.B. 620 took effect, we invited them to submit additional briefing if they opposed a remand for the trial court to exercise the new discretion conferred by the law, and neither party did so. Even though the parties do not oppose this disposition, we turn to the merits to clarify the standard governing the recurring issue of whether a remand is necessary in pending appeals to allow a trial court to exercise its discretion under S.B. 620.

We begin by discussing the general standard for assessing when a remand is required for a trial court to exercise sentencing discretion. "[W]hen the record shows that the trial court proceeded with sentencing on the . . . assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing. [Citations.] Defendants are entitled to 'sentencing decisions made in the exercise of the "informed discretion" of the sentencing court,' and a court that is unaware of its discretionary authority cannot exercise its informed discretion." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.) But if " 'the record shows that the trial court would not have exercised its discretion even if it believed it could do so, then remand would be an idle act and is not required.' " (*People v. Gamble* (2008) 164 Cal.App.4th 891, 901.)

*People v. Gutierrez* (1996) 48 Cal.App.4th 1894 (*Gutierrez*) involved circumstances similar to those in this case. While the *Gutierrez* appeal was pending, our state Supreme Court issued *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, which, in a retroactive decision, "determined that trial courts have discretion to strike three strikes prior convictions in the furtherance of justice." (*Gutierrez*, at p. 1896.) *Gutierrez* concluded that "[r]econsideration of sentencing is required under *Romero* where the trial court believed it did not have discretion to strike a three strikes prior conviction, unless the record shows that the sentencing court clearly indicated that it would not, in any event, have exercised its discretion to strike the allegations." (*Ibid.*)

21

We see no reason why this same standard would not apply in assessing whether to remand a case for resentencing in light of S.B. 620. That is, a remand is required unless the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken a firearm enhancement.

The Second District recently applied a different standard in assessing the propriety of a remand by addressing "whether there [was] any reasonable probability the trial court would exercise its discretion to strike the enhancements so as to justify remanding the matter." (*Almanza, supra*, __ Cal.App.5th __ [p. 15].) It concluded that there was no such probability, and that remand was therefore unnecessary, after considering three factors: the egregious nature of the defendant's crimes, the defendant's recidivism, and the fact that the trial court had imposed consecutive sentences. It pointed out that the "jury convicted [the defendant] of a cold-blooded, premeditated murder committed for the benefit of a criminal street gang. His record includes two prior strikes and a prior prison term. If the trial court were inclined to be lenient, it would have made the sentence for assault concurrent with the sentence for murder." (*Id.* at p. 16.)

*Almanza*'s "reasonable probability" standard echoes the familiar standard for assessing whether state law error was prejudicial under *People v. Watson, supra*, 46 Cal.2d at p. 836, and it may be fitting when the issue is whether a trial court's abuse of its discretion in declining to strike a firearm enhancement requires reversal. (See *People v. Scott* (1994) 9 Cal.4th 331, 355 [where sentencing choice constitutes abuse of discretion, remand for resentencing not required if "it is 'not reasonably probable that a more favorable sentence would have been imposed in the absence of the error' "]; *People v. Bravot* (1986) 183 Cal.App.3d 93, 98 [applying *Watson* to conclude any error in imposing consecutive sentence was harmless].) But, in our view, such a harmless-error analysis is less fitting when the issue is whether a remand is required in light of S.B. 620. When a trial court has abused its discretion in choosing among available sentencing options, such as by relying on an improper sentencing factor, a reviewing court must still affirm unless "the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) In these situations, the trial court has revealed which sentencing

22

choice it prefers, and the reviewing court must decide whether there is a reasonable probability that the trial court's lawful exercise of discretion on remand will lead it to make a different choice. But when, as here, a trial court has made no discretionary choice because it was unaware it had authority to make one, an application of the "reasonable probability" standard requires the reviewing court to decide what choice the trial court is likely to make in the first instance, not whether the court is likely to repeat a choice it already made. While it is true that determining whether a trial court is likely to repeat a choice involves some degree of conjecture, determining what choice the trial court is likely to make in first instance is far more speculative, unless the record reveals a clear indication of how the court would have exercised its discretion.

The three factors *Almanza* relied on in concluding that a remand was unnecessary—the egregious nature of the defendant's crimes, the defendant's recidivism, and the fact that consecutive sentences were imposed—may be germane to assessing whether a trial court is likely to exercise its sentencing discretion in the defendant's favor, but they cannot alone establish what the court's discretionary decision would have been. To be sure, the egregiousness of a defendant's crimes, a defendant's criminal history, and the court's sentencing options and rulings may prompt the court to express its intent to impose the maximum sentence permitted. When such an expression is reflected in the appellate record, a remand would be an idle act because the record contains a clear indication that the court will not exercise its discretion in the defendant's favor. (See *Gutierrez, supra*, 48 Cal.App.4th at p. 1896 [declining to remand where trial court indicated defendant was "the kind of individual the law was intended to keep off the street as long as possible"].) But we believe a remand is necessary when there is no such clear indication of the trial court's sentencing intent. (See *People v. Brown, supra*, 147 Cal.App.4th at p. 1228; *Gutierrez*, at p. 1896.) Firearm enhancements carry heavy terms and in many cases constitute much if not most of the total sentence.[8] Given these

---

[8] For example, the sentencing triad for attempted murder without premeditation is five, seven, or nine years, but a defendant convicted of that crime after shooting the

23

high stakes, it seems to us that a reviewing court has all the more reason to allow the trial court to decide in the first instance whether these enhancements should be stricken, even when the reviewing court considers it reasonably probable that the sentence will not be modified on remand.

We recognize that in some cases any resulting reduction in the sentence will not appreciably reduce the time the defendant must actually serve. This was true in *Almanza*, where the Second District observed that "[e]ven if the trial court . . . were to strike all of the firearm enhancements, it would reduce Almanza's minimum term from 137 years to 112 years," and "[a] 137-year minimum term is no more or less absurd than a 112-year minimum term." (*Almanza, supra*, __ Cal.App.5th __ [p. 15].) But the length of any potentially reduced sentence says nothing about the trial court's intent, and even a very long reduced sentence may someday be further reduced through other avenues of postconviction relief or retroactive legislative changes. A remand for resentencing is not an idle act just because a defendant may not derive a present practical benefit should the trial court exercise its discretion in the defendant's favor.

Here, a remand is proper because the record contains no clear indication of an intent by the trial court not to strike one or more of the firearm enhancements. Although the court imposed a substantial sentence on McDaniels, it expressed no intent to impose the maximum sentence. To the contrary, it imposed the midterm for being a felon in possession of a firearm, and it ran that term concurrently to the term for the murder. It also struck "[i]n the interest of justice" four prior convictions it had found true. Thus, nothing in the record rules out the possibility that the court would exercise its discretion to strike the firearm enhancement under section 12022.53, subdivision (d), which doubled McDaniels's total sentence, and then either impose time for one of the stayed lesser firearm enhancements or strike them as well. While we express no opinion on how the court should exercise its discretion on remand, that discretion is for it to exercise in the first instance.

victim could receive an additional term of 25 years to life for a firearm enhancement. (See §§ 664, subd. (a), 12022.53, subd. (d).)

## III.
### DISPOSITION

McDaniels's convictions are affirmed, but the case is remanded for the trial court to consider whether to strike the three firearm enhancements imposed under Penal Code section 12022.53. The court is also directed to award two additional days of custody credits for the time McDaniels spent in custody in Sacramento County and to ensure the abstract of judgment reflects a term of 25 years to life, not 50 years to life, for the murder conviction. The clerk of the superior court is ordered to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

                       _____

                       Humes, P.J.

We concur:


_____

Margulies, J.


_____

Banke, J.

*People v. McDaniels*  A149015

26

Trial Court:

      Alameda County Superior Court


Trial Judge:

      Hon. Larry J. Goodman


Counsel for Defendant and Appellant:

      Kyle Gee, First District Appellate Project


Counsel for Plaintiff and Respondent:

      Xavier Becerra, Attorney General

      Gerald A. Engler, Chief Assistant Attorney General

      Jeffrey M. Laurence, Senior Assistant Attorney General

      Seth K. Schalit, Supervising Deputy Attorney General

      Lisa Ashley Ott, Deputy Attorney General


*People v. McDaniels*  A149015